Hillsborough
No. 88-263

UNITED SERVICES AUTOMOBILE ASSOCIATION

v.

DIANE WILKINSON, ADMINISTRATRIX OF THE ESTATE OF JOHN
WILKINSON, JR., THE HARTFORD INSURANCE COMPANY, AND
THE UNITED STATES FIRE INSURANCE COMPANY

December 8, 1989

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Mark W. Dean* on the brief, and *Donald Gardner* orally), for the plaintiff.

*Emile R. Bussiere P.A.*, of Manchester (*Richard J. Walsh* on the brief and orally), for the defendant Diane Wilkinson, Administratrix.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Theodore Wadleigh* on the brief, and *Michael Mortimer* orally), for the defendant The Hartford Insurance Company.

*McDonough & O'Shaughnessy P.A.*, of Manchester (*Robert G. Whaland* on the brief and orally), for the defendant The United States Fire Insurance Company.

PER CURIAM. The parties in this declaratory judgment action appeal from a series of rulings made by a Master (*R. Peter Shapiro*, Esq.) and approved by the Superior Court (*C. Flynn, Dalianis, Pappagianis*, JJ.). At issue are the amounts and priorities of uninsured motorist coverage available from various insurers to the Estate of John Wilkinson, Jr., following his death in an automobile accident on May 20, 1982. We consider whether the trial court erred in ruling (1) that intra-policy stacking of uninsured motorist coverage should not be allowed on a fleet automobile insurance

policy held by the decedent's employer, issued by The Hartford Insurance Company (Hartford), because Hartford limited its coverage by clear and unambiguous language; and (2) that under RSA 264:15 the "umbrella" policy issued to the employer by the United States Fire Insurance Company (U.S. Fire) affords uninsured and underinsured motorist coverage to insureds under that policy. For the reasons that follow, we affirm the first ruling and reverse the second.

On May 20, 1982, John Wilkinson (the decedent) was killed when the pickup truck he was driving collided with a dump truck operated by Paul J. Corso. The decedent was driving the pickup truck, owned by his employer, Harvey Construction Company (Harvey), within the scope of his employment.

At the time of the accident, Corso was insured for automobile liability under an Aetna Insurance Company policy which set limits of liability at $25,000. Shortly after the accident the decedent's estate settled with Aetna for $25,000. At that time, no judicial determination as to liability for the accident was made.

At the time of the accident, both the decedent and his employer, Harvey, held insurance liability policies with various insurance carriers. The decedent had a personal automobile insurance policy on his two vehicles issued to him by the United Services Automobile Association (USAA) which provided uninsured motorist benefits up to $100,000 per person and $300,000 per accident. Harvey held a business automobile insurance policy issued by Hartford which provided uninsured motorist coverage for Harvey's entire fleet of business-related autos which included more than thirty vehicles. The master found and Hartford does not challenge that its policy is the primary policy as to uninsured motorist coverage, since it insured the vehicle that was actually involved in the accident. There is a dispute as to whether the Hartford policy provided $300,000 or $330,000 in uninsured motorist coverage per person. The Hartford policy contained limiting language in two separate endorsements, CA 21 07 (Ed. 01 78) and Form C-3005-0 *infra.* Harvey also held an umbrella policy from U.S. Fire that provided excess coverage starting at $500,000 up to a maximum of $15,000,000. U.S. Fire entitled its policy, a "Commercial Cata-strophic Comprehensive Liability Policy."

The Wilkinson Estate filed for arbitration to determine liability for the accident. The arbitration has been stayed pending resolution of the declaratory judgment action now before us on this appeal. There has therefore been no final finding of liability for the accident.

In determining the availability of uninsured motorist coverage, the trial court ruled, *inter alia*, (1) that the Hartford policy coverage could not be stacked because it contained clear and unambiguous language limiting coverage under the uninsured and underinsured motorist provision to $300,000 per person and $500,000 per accident; (2) that the USAA policy provided basic coverage of $100,000 for two vehicles, which could be stacked to afford the decedent's estate $200,000 coverage; (3) that the U.S. Fire umbrella policy provided uninsured and underinsured motorist coverage to the administratrix from $500,000 to $15,000,000; and (4) that the $200,000 uninsured and underinsured motorist coverage provided by the USAA policy could, if the damages warrant it, be "stacked" on the $300,000 coverage provided by the Hartford policy to fill the "gap" between the coverage provided by Hartford's underlying motor vehicle liability policy and U.S. Fire's umbrella-type policy. This appeal ensued.

We first address the amount of coverage afforded by the Hartford policy. The Hartford policy provided uninsured motorist coverage to Harvey's fleet of commercial vehicles. At the time of the accident, Harvey had paid separate uninsured motorist premiums for at least thirty-six of the approximately forty-two vehicles in its fleet. The Hartford business auto policy provided uninsured motorist coverage with stated limits of liability in the amount of $500,000 per accident and either $300,000 or $330,000 per person, depending upon which section of the policy one reads. USAA argues that the Hartford policy coverage should be stacked to provide the Wilkinson estate with coverage of thirty-six times the stated limits of per person liability, for a total of either $10,800,000 or $11,880,000, depending upon whether the policy is interpreted to provide $300,000 or $330,000 per person coverage.

Application of the Hartford policy terms in the instant case presents us with two issues of contract interpretation. The first is whether the applicable per person policy limit of liability is $300,000 or $330,000, and the second is whether the policy's limits of liability are susceptible to stacking.

■■■■ We construe ambiguities in insurance policies against the insurer. *State Farm Mut. Auto. Ins. Co. v. Desfosses*, 130 N.H. 260, 263, 536 A.2d 205, 207 (1987); *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771–72, 423 A.2d 980, 984–85 (1980). An ambiguity includes "all terms about the meaning or application of which reasonable disagreement between the contracting parties is possible." *Smith v. Liberty Mut. Ins. Co.*, 130 N.H. 117, 122, 536 A.2d 164, 166 (1987). The Hartford policy contained two different

per person limit of liability figures, one specifying $300,000 and the other specifying $330,000. We construe the resulting ambiguity against the insurer and apply the $330,000 figure.

The answer to the second Hartford coverage issue requires further analysis. In this State all motor vehicle liability insurance policies must provide policy holders who purchase liability coverage with uninsured motorist coverage in an amount equal to the amount of the liability coverage they purchased. RSA 264:15, I. This statutory provision was intended to allow policy holders to protect themselves against losses caused by irresponsible automobile drivers with insufficient insurance coverage to pay for the injuries they cause to the insured. *Courtemanche v. Lumbermens Mut. Cas. Co.*, 118 N.H. 168, 172–73, 385 A.2d 105, 107–08 (1978) (discussing RSA 268:15-a, I, the precursor to RSA 264:15).

 "'Intra-policy stacking' allows the insured to aggregate the limits of [uninsured motorist] coverage by multiplying the stated limit of liability by the number of vehicles covered under a policy." *Cacavas v. Maine Bonding and Casualty Co.*, 128 N.H. 204, 205, 512 A.2d 423, 424 (1986). Although stacking of uninsured motorist coverage is generally allowed, insurance companies are free to limit their liability and prevent stacking through the use of clear and unambiguous policy language. *Green Mt. Ins. Co. v. Bonney*, 131 N.H. 762, 561 A.2d 1057 (1989) (citing *Cacavas, supra* at 208, 512 A.2d at 425).

 In construing insurance policy language which purports to limit liability or prevent stacking, we employ a strict construction standard which requires that ambiguities in insurance policies be construed in favor of the insured and against the insurer. *See Trombly, supra* at 770–72, 423 A.2d at 985; *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 251 (1983).

The Hartford policy contains two clauses which purport to limit stacking liability. The first is endorsement CA 21 07 (Ed. 01 78), which provides:

> "Paragraph 1 of OUR LIMIT OF LIABILITY is changed to read:
> 1. Regardless of the number of covered *autos, insureds,* claims made or vehicles involved in the *accident, our* limit of liability is as follows:

a. The most *we* will pay for all damages resulting from *bodily injury* to any one person caused by any one *accident* is the limit shown in this endorsement for 'each person'.

b. Subject to the limit for 'each person', the most *we* will pay for all damages resulting from *bodily injury* caused by any one *accident* is the limit shown in this endorsement for 'each *accident*'.

c. If coverage for *property damage* is provided by this insurance, the most *we* will pay for all damages resulting from *property damage* caused by any one *accident* is the limit of *property damage* shown in this endorsement for 'each *accident*'."

(Emphasis in original.) The second was endorsement Form C-3005-0, which reads:

"OUR LIMIT OF LIABILITY is changed to read:

A. Regardless of the number of covered *autos, insureds,* claims made or vehicles involved in the *accident, our* limit of liability is as follows:

1. The most *we* will pay for all damages resulting from *bodily injury* to any one person caused by any one *accident* is the limit of *Bodily Injury* Liability shown in ITEM TWO of the Declarations for 'each person'.

2. Subject to the limit for 'each person', the most *we* will pay for all damages resulting from *bodily injury* caused by any one *accident* is the limit of *Bodily Injury* Liability shown in ITEM TWO of the Declarations for 'each *accident*'.

3. The most *we* will pay for all damages resulting from *property damage* caused by any one *accident* is the limit of *Property Damage* Liability shown in ITEM TWO of the Declarations.

B. All *bodily injury* and *property damage* resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one *accident*."

(Emphasis in original.)

USAA argues that the strict construction standard set down in *Trombly* requires a finding that the limitation of liability language set forth in the Hartford policy is not sufficiently clear and unambiguous as to repudiate Harvey's reasonable expectation that

it would receive additional uninsured motorist coverage for each of the thirty-six premiums that it paid. It argues that the policy should have contained specific language explicitly making it clear that stacking would not be allowed "regardless of the number of premiums paid." Defendant U.S. Fire joins in this stacking argument and also points to numerous miscellaneous change endorsements in the policy and an ambiguity as to the effective date of the policy's split uninsured motorist limits, as two additional factors which make the policy ambiguous.

The Wilkinson Estate also joins in the stacking argument and supplements it with citations from other jurisdictions which permit the stacking of uninsured motorist benefits even when those benefits are part of a fleet policy.

We have addressed the issues of inter- and intra-policy stacking of uninsured motorist coverages in several recent cases; hence we need not rely upon cases from other jurisdictions. In *Courtemanche v. Lumbermens Mut. Cas. Co.*, 118 N.H. at 173, 385 A.2d at 107–08, we overruled prior case law which limited insured plaintiffs' recovery to the statutory minimum amount and allowed plaintiffs to stack the coverages of as many uninsured motorist policies as are applicable to them, up to their total damages. In *Descoteaux v. Liberty Mut. Ins. Co.*, 125 N.H. 38, 45, 480 A.2d 14, 19 (1984), we found under the current revised version of the uninsured motorist coverage statute that when insured plaintiffs paid separate premiums on separate policies written by the same carrier, they were entitled to stack the coverage of each uninsured motorist endorsement to determine the amount of recovery available.

Relying on these rules in *Cacavas v. Maine Bonding & Casualty Co.*, 128 N.H. at 207–08, 512 A.2d at 425, we found that the policy language regarding uninsured motorist coverage was ambiguous and applied the *Trombly* strict construction rule to read the policy against the insurer. However, we also made it clear in *Cacavas* that insurance companies are free to limit their liability for intra-policy stacking through "clear and unambiguous policy language." *Id.* at 208, 512 A.2d at 425.

More recently, in *Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 171, 551 A.2d 962, 972 (1988), we found that the following policy language met the *Cacavas* test by clearly and unambiguously limiting uninsured motorist coverage to the applicable "each person" amount, regardless of the number of automobiles to which the policy applied:

*"'Regardless of the number of* (1) persons or organizations who are insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage, or (4) *automobiles or trailers to which this policy applies, METROPOLITAN's liability is limited as follows*:

. . . .

*"The limit for Protection Against Uninsured Motorist Coverage stated in the Declarations as applicable to each person is the limit of METROPOLITAN's liability for all damages, arising out of bodily injury sustained by one person in any one accident,* and subject to this provision, the limit of liability stated in the Declarations as applicable to each accident is the total limit of METROPOLITAN's liability for all such damages for bodily injury sustained by two or more persons in any one accident.'"

(Emphasis added.) The language in the Hartford policy similarly limits liability to the stated policy limits regardless of the number of covered persons, automobiles, injuries, or claims involved in the accident, and is thus sufficient to preclude stacking. We do not see that there is any practical difference between the operative language in the Hartford limitation of liability clause and the clause employed by Metropolitan in *Gelinas.*

The second issue in this case is whether U.S. Fire's umbrella-type liability policy must afford the type of uninsured motorist coverage required by RSA 264:15 to the Wilkinson Estate. At the time of the accident, Wilkinson's employer, Harvey, held a comprehensive liability policy, commonly referred to as an "umbrella" policy, provided by U.S. Fire. The policy was officially titled "Commercial Comprehensive Catastrophe Liability Policy." The umbrella policy provided Harvey with $15,000,000 liability coverage for claims in excess of $500,000. This policy referred to a schedule of underlying insurance policies which included the business automobile liability insurance policy provided to Harvey by Hartford. The policy did not contain any specific reference or endorsement concerning uninsured motorist coverage.

U.S. Fire does not dispute that the umbrella policy would afford liability coverage with respect to the automobile driven by the decedent in this case. Rather, it argues that, because the policy is an umbrella policy and contains no reference to a specific motor vehicle or an uninsured motorist coverage endorsement, it should

not be characterized as a "motor vehicle liability policy" subject to the uninsured motorist liability coverage requirements of RSA 264:15. U.S. Fire suggests that the unique nature of umbrella-type policies, which provide at a modest cost broad coverage for catastrophic losses, and excess coverage over and above any type of primary coverage, takes umbrella-type policies out of the realm of automobile liability insurance policies contemplated by the statutory scheme defining insurance policies for the purpose of required uninsured motorist coverage. We agree that umbrella-type policies differ from typical motor vehicle liability policies. They also do not fit the legislative definition of a motor vehicle liability policy. Therefore, we reverse the ruling that U.S. Fire's umbrella-type policy provides uninsured motorist coverage in amounts above $500,000, up to $15,000,000.

The statutory definition of a motor vehicle liability policy requires that such a policy cover the insured's motor vehicle.

> "'[A] [m]otor vehicle liability policy' shall mean a policy of liability insurance which provides:
> I. *Indemnity for or protection* to the insured and any person responsible to him for the operation of the *insured's motor vehicle*, . . . against loss by reason of the liability to pay damages to others for damage to property . . . or bodily injuries, including death . . . accidentally sustained . . . ."

RSA 259:61 (emphasis added). U.S. Fire's umbrella-type policy does not insure Harvey's vehicles, in particular. Rather, it insures Harvey against rare catastrophic liability by providing excess coverage, over and above that provided by Hartford's underlying business automobile liability policy, to which it refers. Hartford's policy, and not U.S. Fire's, covers Harvey's automobiles with respect to the coverage at issue in this case.

The umbrella-type policy also does not provide the minimum amounts of coverage required by the statute. RSA 259:61 mandates that a motor vehicle liability policy:

> "shall . . . provide[ ] . . . protection to the insured . . . to the amount or limit of at least *$25,000* on account of injury to or death of any one person, . . . at least *$50,000* on account of any one accident resulting in injury to or death of more than one person, and at least *$25,000* for damage to property of others . . . ."

*Id.* (Emphasis added.) The policy here provides coverage only for liability in excess of $500,000, up to $15,000,000. It falls short of the $25,000 per person, $50,000 per accident and $25,000 total property damage coverage requirements of RSA 259:61.

Moreover, our holding today comports with our prior recognition of the unique nature of umbrella-type policies. In *CNA Insurance Company v. Hartford Insurance Company*, 129 N.H. 243, 525 A.2d 722 (1987), we distinguished umbrella-type policies from comprehensive general liability policies that have exclusions that render them excess to other policies:

> "An umbrella excess third-party liability policy is a unique form of coverage unlike any other form of excess coverage . . . . Of importance also, apart from the unique character of an umbrella policy in general, is the supplemental schedule of underlying coverage contained in CNA's policy and relied on by it to establish the truly excess character of its coverage . . . . This schedule, we believe, expresses a crystal clear intent that the CNA policy be excess over and above all other coverage listed in its schedule. . . . Our conclusion is reinforced by the treatises and case law on the subject: '[U]mbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses.' 8A J. APPLEMAN AND J. APPLEMAN, [INSURANCE LAW AND PRACTICE § 4909.85] at 452, 453–54 [(rev. ed. 1981)]."

*Id.* at 247, 248, 525 A.2d at 725–26. Consequently, umbrella-type policies are distinguishable from motor vehicle liability policies for the purpose of uninsured motorist coverage required by RSA 264:15.

Our legislature clearly intended uninsured motorist coverage to equal motor vehicle liability coverage, thereby allowing one to protect oneself against uncompensated injury from uninsured motorists to the same extent one protects oneself against liability. *See Descoteaux*, 125 N.H. at 45, 480 A.2d at 19; *Courtemanche*, 118 N.H. at 172, 385 A.2d at 107. RSA 264:15 requires insurers to provide uninsured motorist coverage in at least the minimum amounts required under RSA 259:61, and "[w]hen an insured elects to purchase liability insurance in an amount greater than the minimum coverage required by RSA 259:61, his uninsured motorist coverage shall automatically be equal to the liability coverage elected." RSA 264:15. The statute provides no opportunity to refuse such coverage. *Id.*

■ While we recognize the legislature's intention to require uninsured motorist coverage to equal motor vehicle liability coverage, in whatever amounts it is purchased, we do not assume the legislature intended this requirement to apply to whatever form the coverage takes. If the legislature desires uninsured motorist coverage to equal liability coverage from any source, including umbrella-type policies, it may amend the statute accordingly. We reverse the court's finding that U.S. Fire's umbrella-type policy provides uninsured motorist coverage.

■ Finally, we affirm the court's holding that the $200,000 of uninsured and underinsured motorist coverage provided by the USAA policy could, if the damages warrant it, be "stacked" on the coverage provided by the Hartford policy. However, we pause to mention that our reversal of the court's ruling that U.S. Fire's umbrella-type policy provides uninsured motorist coverage eliminates the "gap" which the "stacking" that we allow here would have filled under the trial court's order. As discussed above, it is well settled that uninsured motorist benefits can be stacked to determine coverage. This may be done by "stacking" coverage from as many uninsured or underinsured motorist policies as are available to the insured, up to his total damages. *Courtemanche*, 118 N.H. at 171–73, 385 A.2d at 107–08.

In closing, we note that, as U.S. Fire points out in its brief, the plaintiff has failed to brief the priority issue. Accordingly, we consider it waived and will not address it.

*Affirmed in part and reversed in part.*

THAYER, J., did not sit; BATCHELDER, J., dissented.

BATCHELDER, J., dissenting: Because I disagree with the court's holding that umbrella-type policies are not motor vehicle liability policies for the purpose of the uninsured motorist coverage requirement of RSA 264:15, I dissent. A plain reading of RSA 259:61, as well as both the legislative intent that uninsured motorist coverage equal motor vehicle liability coverage and the current practice of the insurance department, as I discuss *infra*, require that U.S. Fire's policy provide uninsured motorist coverage to the Wilkinson Estate.

Under the plain language of RSA 259:61, the policy is a motor vehicle liability policy. U.S. Fire's policy is certainly a policy of liability insurance covering loss caused by the accidental death of, or injury to, any person other than Harvey, or his employees, or

property damage arising out of the operation of Harvey's motor vehicles. *See* RSA 259:61.

Similarly, the policy meets the $25,000 per person, $50,000 per accident and $25,000 total property damage coverage requirements of RSA 259:61. The Hartford business automobile liability insurance policy and the umbrella-type policy, which refers to the Hartford policy, provide coverage sequentially. In essence, the umbrella-type policy provides coverage in the statutorily required amounts through the underlying, referenced business automobile liability insurance policy.

Moreover, I would give more weight to what the court simply notes in passing: the legislature has clearly intended for uninsured motorist coverage to equal motor vehicle liability coverage. I would hold that we give effect to this intention here.

In addition, as cited by the master in his report, Robert Plumb, director of the property and liability insurance division of the New Hampshire Insurance Department, stated in his affidavit that the insurance department has taken the position that the provisions of RSA 264:15 are applicable to umbrella-type policies. While the insurance department's position is apparently not a formal rule, *see* RSA 541-A:1, XIII, or a declaratory ruling, *see* RSA 541-A:1, IV, and, therefore, not entitled to the same weight as if it were either one, *see Petition of Daly*, 129 N.H. 40, 41, 523 A.2d 52, 53 (1986), we should not turn our backs on an announced policy of the insurance department.

Finally, I note that these umbrella-type policies, which appear to provide catastrophic liability coverage while charging low premiums, actually charge low premiums because they involve a very high deductible; in this case $500,000. I would hold that we affirm the trial court's ruling that U.S. Fire's umbrella-type policy provides uninsured motorist coverage in amounts above $500,000, up to $15,000,000.